ELIZABETH SAUNDRY, Appellee, v. JOHN SAUNDRY et al.,
Appellants.

**DEEDS:** Undue Influence. Evidence held insufficient to show that
a deed from mother to son was obtained by undue influence.

*Appeal from Fayette District Court.*—H. E. TAYLOR, Judge.

### JULY 6, 1920.

PLAINTIFF is a widow, about 80 years of age, and the
defendant John Saundry is her son, and his codefendant, his
wife. Plaintiff brings this action to set aside a deed con-
veying a farm of 120 acres to her son, and to recover $5,000
alleged to be due her as rent. There was a decree and a
judgment for $2,000 in favor of the plaintiff in the court
below. Defendants appeal.—*Reversed.*

*E. R. O'Brien* and *D. D. Murphy,* for appellants.

*W. W. Comstock,* for appellee.

STEVENS, J.—The questions involved in this case are
largely questions of fact. Counsel differ widely in their
interpretation of the evidence and its probative effect, and
consequently in the application of legal principles thereto.

The grounds upon which plaintiff asks the cancellation of
the deed are that same was procured by fraud and undue
influence, without adequate consideration; and that, at the
time, the parties stood in a confidential or fiduciary rela-
tionship. The defendant denies these claims by the plain-
tiff, and avers that the deed was executed for an adequate
consideration, in pursuance of a prior, oral agreement; that
he expended large sums of money in the improvement of
the land, with the knowledge and consent of plaintiff; and

that she subsequently ratified and confirmed the conveyance thereof to him.

Plaintiff was twice married; the first time in England, to John Quintrell, and the second time to John W. Saundry, the father of the defendant, at Hazel Green, Wisconsin. At the time of her marriage to Saundry, she had two children, J. H. and Percival Quintrell; and her husband had a daughter, about 14 years of age. The children of her second marriage are the defendant, Alberta Edwards, and William Saundry, all of whom were born before the family moved to Fayette County, which was in the early 80's. Defendant's father, shortly after his arrival in Iowa, purchased 160 acres of land, of which the farm in controversy is a part. The defendant was married in 1891, and, in accordance with a previous understanding between them, went with his wife to reside with his parents on the farm. In 1892, defendant's father and mother moved to Oelwein, and orally leased the farm to him for a cash rental of $2 per acre; defendant to keep up the improvements thereon. John Saundry, Sr., died in 1897, but the defendant continued to reside on the farm and pay rent to his mother, as he had previously done to his father, until 1911, when the deed in question was executed. Shortly prior to the execution of the deed, plaintiff became involved in a controversy with a Mrs. Porter, a neighbor woman, resulting in the arrest of both of them, each filing complaint against the other. The cause of the trouble was charges made by plaintiff against the character of Mrs. Porter. After plaintiff's arrest, she notified the defendant, who came to town, and by his efforts procured a dismissal of both prosecutions. Plaintiff learned in some way, either from her son-in-law or from the defendant,—and upon this point the evidence is in dispute, the defendant claiming he did not tell her,— that Mrs. Porter was threatening to sue her for $10,000 damages. On August 8, 1911, the deeds conveying the farm and the home in Oelwein to the defendant were executed. Later, Mrs. Porter brought an action against plaintiff for $10,000 damages, which was finally compromised and

settled by the payment by the defendant John Saundry of $100, for his mother, for that purpose. Following this settlement, he reconveyed the Oelwein property to plaintiff; but she claims he refused to reconvey the farm, giving as a reason that his wife declined to sign a deed.

There is a dispute in the evidence as to these transactions, the plaintiff testifying that, when she made the deed, the defendant specifically agreed to reconvey it to her as soon as the damage case was disposed of, and that she made the conveyance upon his representations that it was the best thing to do, in view of the threatened suit for damages. The defendant, however, testified that, while the immediate cause of the execution of the deed was the threatened action for damages, the real consideration was an oral agreement that he should have the farm, upon certain conditions to be performed by him, entered into between them in 1901. Concerning this alleged oral agreement, the defendant testified that, the year following his marriage, he concluded to leave home, and rent another farm; that his parents, learning of his intention, remonstrated, and agreed with him that, if he would remain, he might occupy and cultivate the land, for a cash rental of $2 per acre, that they would move to town, and that ultimately the farm would belong to him; that, in 1901, he had an opportunity to purchase a tract of 119 acres, at $40 per acre, and informed his mother that he intended to buy the same; that she objected, and urged him to remain upon the farm, promising that it should be his, that he could have it at a valuation of $50 per acre, the consideration to be paid in different amounts to her children, and that she would fix it so he would get it; that he finally decided to remain on the farm, and continue to pay rent to his mother at $2 per acre.

Mrs. Edwards, called on behalf of the plaintiff, testified that she and her brother John Quintrell had an interview with defendant at the home of her mother, in her presence, in which the mother stated that defendant refused to reconvey the farm, because his wife would not join in the conveyance. The defendant, however, gives an entirely dif-

ferent version of this meeting, insisting that, when he entered the house, Mrs. Edwards was angry, and demanding something of her mother, and he denies that the mother at any time requested a reconveyance of the farm.

It appears without conflict in the evidence that plaintiff, on the 23d day of April, 1901, went alone to the office of an attorney, and executed a will, devising the farm to the defendant, but requiring him to pay $1,000 each to Percy Quintrell, J. H. Quintrell, and Alberta Edwards, and the sum of $2,000 to William Saundry, and $200 to another party named. This was shortly after the alleged oral agreement was made, and after she had informed the defendant of the amount to be paid to each of the children. The defendant testified that his mother gave the will to him, saying, "This is yours, and keep it, and the farm is yours." When questioned, upon cross-examination, plaintiff sought to deny any knowledge of the first will, and professed to be ignorant of the provisions of the second will; but she later modified or explained this testimony. Her family physician, Dr. Pattison, testified that, a few days before the execution of the second will, he called at her home, in response to her request, at which time she informed him that she desired to make a will, stating the disposition she desired to make of her property, and asked him to recommend a suitable attorney to prepare the instrument for her. A day or two later, she sent for the defendant, who went to town, and according to his testimony, plaintiff told him that she desired to make a new will, and that she had concluded to leave her son William, who is a mute, $4,000, and to Mrs. Edwards $1,500, instead of $1,000, as provided in her former will; and requested that, as J. H. Quintrell was getting old, he be paid his $1,000 at once. Percy Quintrell was deceased, at the time the second will was made. The defendant took plaintiff in his surrey to the office of Dr. Pattison, where she met an attorney, and a will was drawn up and executed by her. About the same time, the defendants executed a note, payable to plaintiff, for $5,500, together with a mortgage upon the farm, to secure the payment

thereof. The mortgage represented the aggregate of cash bequests made by the will. This mortgage was recorded, and the note delivered to plaintiff. Several interest payments are endorsed on the note. After the execution of these papers, the defendant expended considerable sums of money in improvements on the farm, $2,600 of which, he claims, was used in rebuilding the house.

Defendant ceased to pay rent, after he received the deed, but paid plaintiff $250 per year, as interest on the note. For a period of four years after the meeting at her mother's, referred to above, Mrs. Edwards had been estranged from her mother. The reason given by her therefor is that her mother refused to do right by her in the division or distribution of her property. During about three years of this time, she resided across the street from plaintiff, who was, upon one or more occasions, seriously ill; but she did not go to see her. She was taken care of by defendants, or by others employed and paid by John Saundry, defendant.

Upon the question of confidential relationship and undue influence, there is little evidence. Plaintiff concedes that her son was, until recently, kind to her, and it appears from the evidence that she resided in his home, from time to time, and for one year before she went to live with Mrs. Edwards; and that, when requested by her, he looked after her welfare. She does, however, complain of her treatment by his wife, while she last lived with him; but this is generally denied by defendant. It is claimed that he was her sole business confidant and adviser; but, if so, she had little business to be transacted. She was paid $240 per year rent for the farm, and it does not appear that the defendant had anything to do with the expenditure thereof. She did not consult him, before she filed the complaint against Mrs. Porter, and, when she concluded to execute a second will, first consulted her family physician, and not the defendant. Some claim is made by her that defendant dictated the terms of the will. In this, however, she is not supported by the evidence. Dr. Pattison was present when the will was prepared, and signed it as a witness, at her request. He

testified that the attorney made a memorandum, before preparing the will, from statements and information given him by plaintiff. The defendant took plaintiff to the office, but went away, and was not present when the will was prepared and executed. As stated, she requested defendant to pay her son J. H. Quintrell $1,000 at once. This, the evidence shows, the defendant did, and the will recites that he has received his full share of her estate.

It is suggested in argument that the $1,000 paid by the defendant to Quintrell was not at the request of plaintiff, but for another purpose. The defendant denies that he induced his mother to make the deeds to him by representing to her that Mrs. Porter was going to bring an action for damages, but avers that she had concluded to deed the land to him. Upon this point, he testified:

"I saw my mother again after that, within a few days. I saw her pretty often, most of the time. She again mentioned the Porter matter, and said that Shorty Edwards— that is my sister's husband—said that Mr. Porter was going to sue her for $10,000. I said: 'I don't know as he is going to or not. There is no use in getting excited over that until you find out for sure.' I guess that is all that was said that day. I saw her a day or so after that, and she said, 'Well, Porter is going to sue me for $10,000,' and she says, 'Well, I will fix that.' She said, 'That farm is yours, and you have got your life's work in it, and I sold you the farm, away back, years ago, and I will just deed that farm to you.' That is the words she told me. She said she wanted me to get a deed made, and have it signed and recorded. I had Mr. Jamison do that, I think the next day or so. I am not positive as to that. The next day, she told me, when I come up, that somebody had told her she better deed her house and lot off to me, and I said, 'Mother, that is not necessary,—they can't take your house and lot;' but she said she wanted to deed that, too. She wanted to be sure that Willie had that, when she was through with it, and she says, 'John, I want you to promise that, when this deed is given to you and recorded, you will abide by my settlement

with you in 1901, and live up to what my will calls for.'
I says, 'Mother, I will do it.'  And the deed was made and
recorded."

The court below held that the conveyance was procured
by fraud, and that the defendant held the property in
trust for the plaintiff; set aside the conveyance; and
awarded judgment against defendant for $2,000 rent.  We
are unable to agree with this conclusion.  That the deed
would not have been executed by the plaintiff in the absence
of the threatened damage suit may be conceded, as it may
also be conceded that plaintiff had always desired to retain
the title so long as she lived; but it seems to us that the
existence of a prior agreement and understanding between
the parties is fully established by the evidence.  The testi-
mony of the defendant upon this point is in harmony with
the conduct of the plaintiff and the entire course of dealing
between them.  The second will, which was executed after
the conveyance, differs but little from the first one.  She
does not claim that the first will was not executed volun-
tarily, or that she did not understand or intend the dis-
position of her property, as therein set forth.  The amount
bequeathed to her son William is doubled, and $500 is
added to the bequest in favor of her daughter.  In the first
will, she devised the farm to the defendant; and in the
second, specifically acknowledged that she had conveyed
the same to him.  In the first will, she bequeathed her son
J. H. Quintrell $1,000, and in the second, recited that he
had already received his full share of her estate.  This was
in accordance with the facts.

Prominence is given, in the argument of counsel, to a few
circumstances which appear to us of little importance.
The defendant testified that he took some flowers to his
mother on Mother's Day.  In this connection, he testified
that this was in accordance with his custom.  This is not
denied.  The circumstance hardly shows a desire to take
advantage of his mother.  The second will contained a pro-
vision reducing the bequest to Mrs. Edwards to $5, if she
contested the probate of the will.  It is suggested that this

clause could hardly have originated with the plaintiff, and that it was probably inserted at the suggestion of defendant; but the record contains no evidence to that effect, but does show that Mrs. Edwards, a few days before the execution of the will, left her mother's home in a fit of anger, and never thereafter visited her mother, although the latter continued to reside across the street for about three years, when she went to reside with the defendant.

The will was prepared by a competent attorney, from information received from the plaintiff. She did not testify that the defendant requested the execution of the second will, or that she conversed with him about the matter until the day before its execution, which was after the talk with Dr. Pattison. So far as is disclosed by the record, the defendant opposed, rather than suggested, its terms. It conferred no benefit upon him, except that he was named as the executor thereof, without bond. The mortgage given to secure the payment of the $5,500 note was promptly recorded, and the note delivered to plaintiff. It was in her possession when she left defendant's home, where she had resided for a year. This was after the execution of all of the instruments referred to. She went to live with Mrs. Edwards, after receiving word from her that she was welcome to do so, if she desired; since which time she has executed another will, the contents of which were not revealed upon the trial. Some claim is also made that plaintiff had little education, and was wholly without business experience. According to her testimony, she quit school when very young; but, according to all of the testimony, defendant's father, who had been a miner all his life, and knew little or nothing about farming, promptly turned all money received by him over to plaintiff, who retained it until it was necessary to spend it. It is not claimed that she was mentally incompetent. Her testimony shows that she was alert, and clearly comprehended and understood the effect of the several instruments executed by her. She knew that her will could be revoked and changed whenever she desired. Most of the improvements were placed on the

farm by defendant after the deed was executed, but this was manifestly done with the full knowledge of plaintiff. She could not have forgotten or overlooked that defendant retained the deed; that she had possession of the note; that he was paying her interest in the sum of $250, instead of rent in the sum of $240 per year; that she had executed a will, in which she had specifically recognized the conveyance, and the settlement by the defendant with her son J. H. Quintrell; that he was paying the taxes on the land, and claiming absolutely to be the owner thereof. The claim of the defendant that he expended $6,000 in improvements is, perhaps, an exaggeration, but that he spent considerable is conceded. It makes little difference whether the burden of proof rests upon the defendant, as claimed by counsel for appellee, or not, as the evidence leaves no doubt that plaintiff and defendant at all times dealt fairly with each other, and with a full and complete understanding of the effect of the several instruments executed. She changed her mind after she went to reside with Mrs. Edwards. It is true that the land at the time the deed was executed was much more valuable than it was in 1901, but that was the time when the parties agreed upon the terms upon which the defendant was to have the farm. Its market value at that time did not exceed $40 to $60 per acre. The disposition of her property by each of the two wills is in harmony with the testimony of defendant, and shows that plaintiff had changed her mind, when she came to make the second will, only regarding the amounts she desired to give to her mute son and to her daughter. The large increase in the value of the land results in a much greater advantage to the defendant than she contemplated at the time the wills and deed were executed, but this affords no ground for setting it aside.

It will serve no good purpose to discuss the various legal propositions referred to by counsel, or to review the cases cited. The principles applicable to the facts of this case are familiar, and do not call for extensive statement or consideration. It is our conclusion that plaintiff has failed

to make out a case. The proof does not sustain the allegations of the petition. It follows that the decree and judgment of the court below must be and are—*Reversed.*

WEAVER, C. J., LADD and GAYNOR, JJ., concur.